## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SHAUN DUCREPIN, on behalf of himself, and all others similarly situated, | ) ) ) ) | |
| *Plaintiff,* | ) ) | Case No. _____ |
| v. | ) ) | |
| UNITED SEATING AND MOBILITY, LLC d/b/a NUMOTION. | ) ) ) | **Jury Trial Demanded** |
| *Defendant.* | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, SHAUN DUCREPIN (hereinafter, "Plaintiff"), on behalf of himself, and all others similarly situated, for his causes of action against Defendant, UNITED SEATING AND MOBILITY, LLC d/b/a NUMOTION ("Defendant" or "Numotion"), alleges upon personal knowledge as to his own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This action arises out of the unauthorized disclosure of the confidential personal information, Personally Identifying Information[1] ("PII"), of Plaintiff and the proposed Class Members, approximately 4,190 current and former employees of

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

Case 3:24-cv-00545    Document 1    Filed 05/02/24    Page 1 of 49 PageID #: 1

Defendant Numotion, from February 29, 2024 to March 2, 2024. Specifically, between February 29, 2024 to March 2, 2024, "an unknown, unauthorized third party accessed [Numotion's] computer systems," "encrypted some of [its] computer files[,]" and "may have accessed and acquired certain files from [its] systems[.]"[2] The data security incident exposed the names, dates of birth, Social Security numbers, and employment information of Plaintiff and the Class (the "Data Breach").

2.      Numotion "is the nation's largest and leading provider of products and services to help individuals with mobility limitations[.]"[3] Numotion offers Complex Rehab Technology (CRT) products and accessories, innovative lifestyle products, service and repair, catheters, wheelchair accessible vehicles, and other services for individuals with mobility challenges.[4]

3.      As a condition of employment, employees are required to entrust Defendant with their sensitive, private PII, including names, dates of birth, social security numbers, and other personal information.

4.      According to Defendant's April 15, 2024 letter notifying Plaintiff and other affected individuals of the Data Breach (Ex. A) ("Data Breach Notice"), mostly between February 29, 2024 to March 2, 2024, an unauthorized person gained access to Numotion's network and acquired files containing data including Plaintiff's and

---

[2] *See*: Numotion's Data Breach Notification to Maine Attorney General, available at https://apps.web.maine.gov/online/aeviewer/ME/40/e5e83591-a395-42ca-b1a7-7b1330b08acc.shtml (last accessed May 1, 2024); Numotion Sample Notice of Security Incident, **attached as Exhibit A.**
[3] https://www.numotion.com/about-us
[4] *Id*

Class Members' PII, such as their Social Security numbers.

5.     On information and belief, Numotion failed to undertake adequate measures to safeguard the PII of Plaintiff and the proposed Class Members, including failing to implement industry standards for data security to protect against cyberattacks in the Data Breach.

6.     Although Numotion discovered the Data Breach on or about March 2, 2024, it failed to notify and warn employees of the unauthorized disclosure of their PII therein until April 15, 2024, over six weeks later.

7.     As a direct and proximate result of Defendant's failures to protect employees' sensitive PII and warn them promptly and fully about the Data Breach, Plaintiff and the proposed Class Members have suffered widespread injury and damages necessitating Plaintiff seeking relief on a class wide basis.

8.     Plaintiff brings this action on behalf of himself, and all others similarly situated, the proposed Class of persons whose PII was compromised in the Data Breach, asserting causes of action for (I) Negligence; (II) Breach of Implied Contract; (III) Unjust Enrichment; (IV) Breach of Confidence; (V) Invasion of Privacy, Intrusion Upon Seclusion; and (VI) Bailment.

**PARTIES**

9.     Plaintiff is a natural person, resident and citizen of the State of Minnesota with a primary residence in St. Paul, Minnesota, where he intends to remain. Plaintiff is a victim of Defendant's Data Breach.

10.     United Seating and Mobility, LLC d/b/a Numotion is a limited liability

3

company formed under the laws of Missouri. Numotion's principal office is located at 805 Brook Street, Suite 402, Rocky Hill, Connecticut. 06067. Numotion's headquarters are located at 155 Franklin Road, Suite 300, Brentwood, Tennessee, 37027. Numotion has thousands of employees located throughout the United States.

## JURISDICTION AND VENUE

11. This Court has personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State and it maintains its headquarters in Brentwood, Tennessee.

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than one hundred (100) members in the proposed Class, and at least one member of the class is a citizen of a state different from Defendant.

13. The Court has supplemental jurisdiction over Plaintiff's claims arising under state law under 28 U.S.C. § 1367.

14. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this district and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

### A. Defendant Numotion

15. Numotion "is the nation's largest and leading provider of products and

services to help individuals with mobility limitations[.]"[5]  Numotion offers Complex Rehab Technology (CRT) products and accessories, innovative lifestyle products, service and repair, catheters, wheelchair accessible vehicles, and other services for individuals with mobility challenges.[6]

16.  Numotion is headquartered in Brentwood, Tennessee.  Numotion has over 150 locations throughout the country, serves over 300,000 individuals, and has more than 3,100 employees.[7]

17.  As a condition of employment, Numotion requires that its employees disclose their PII, including their names, dates of birth, social security numbers, and other personal information.

18.  In exchange for this information, Numotion promises to safeguard its employees' PII, and to only use this confidential information for authorized purposes.

19.  Defendant acknowledges the importance of properly safeguarding the private data and PII of its employees, maintaining policies on Employee Data Privacy and Proprietary & Confidential Information ("Privacy Policy")[8]  in which promises its employees to keep their PII safe:

## Employee Data Privacy

### BACKGROUND

Special laws and rules protect the privacy and confidentiality of personal

---

[5] https://www.numotion.com/about-us
[6] *Id.*
[7] *Id.*
[8] *See* Code of Conduct, available at
https://secure.ethicspoint.com/domain/media/en/gui/75178/code.pdf (Relevant excerpts are attached as Exhibit B.

5

data.

**CORPORATE PRINCIPLE**

Numotion respects the confidentiality of the personal information of employees. This includes medical and personnel records. Access to personal information is only authorized when there is a legitimate and lawful reason, and access is only granted to appropriate personnel. Requests for confidential employee information from anyone outside our company under any circumstances must be approved in accordance with our policies.

**MY ROLE**

I respect the personal information of my fellow employees. I will not access or seek access to anyone else's personal data, except when absolutely necessary and then only in compliance with company policies and applicable law. When in doubt, I will contact Numotion's Human Resources department or the Legal and Compliance Department.

## Proprietary & Confidential Information

**BACKGROUND**

Numotion holds certain information as confidential and proprietary information, or trade secrets, about our Company, our customers, our prospective customers, our payors, or others. This information is a cornerstone of our business success. Unauthorized sharing of this information could lead to significant losses for the Company and to serious civil and criminal consequences for the employee involved.

**CORPORATE PRINCIPLE**

Numotion takes great care to protect its trade secrets and confidential information. Employees, officers and directors must maintain the confidentiality of all information entrusted to them, except when disclosure is authorized or legally required. Confidential or proprietary information includes, among other things, any non-public information concerning Numotion, including its businesses, financial performance, results or prospects, and any nonpublic information provided by a third party with the expectation that the information will be kept confidential and used solely for the business purpose for which it was conveyed.

**MY ROLE**

I will handle all Numotion information carefully and will not disclose it to unauthorized persons. I take great care to protect Numotion's trade secrets and confidential information. I will not disclose any Numotion trade secret or confidential information during or after my employment with Numotion except when legally required to do so.

Ex. B.

20.     None of the above permitted purposes for Numotion's disclosure of PII as set forth in the Privacy Policy include the Data Breach.

21.     Plaintiff and the proposed Class Members, employees of Numotion, would not have entrusted their PII to Defendant in the absence of its promises to safeguard that information, including in the manner set forth in Defendant's Privacy Policy.

22.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and the proposed Class Members' PII, Defendant assumed legal and equitable duties to Plaintiff, and the members of the Proposed Class, and knew or should have known that it was responsible for protecting hers and their PII from unauthorized disclosure.

23.     At all times Plaintiff and the members of the Proposed Class, have taken reasonable steps to maintain the confidentiality of their PII; and, Plaintiff and the proposed Class Members, as employees of Numotion, relied on Defendant to keep their PII confidential and securely maintained.

**B.      Numotion Fails to Adequately Safeguard Current and Former Customers' PII—the Data Breach**

24.     Plaintiff and the proposed Class Members are employees of Defendant, Numotion.

7

25.    As a condition of employment, Defendant required Plaintiff and the proposed Class Members to provide Numotion with their sensitive PII, including names, dates of birth, social security numbers, and other personal information.

26.    Numotion then collected and maintained said PII in its computer information technology systems and networks.

27.    On information and belief, between February 29, 2024 and March 2, 2024, an unauthorized gained access to Numotion's networks, enabling them to access certain client data including Plaintiff's and Class Members' PII, including their Social Security numbers and employment information—the Data Breach.

28.    Specifically, according to Numotion:

**What Happened?** On March 2, 2024, we discovered that we were the victim of a cyber-attack. Upon learning of the incident, we promptly began an investigation and worked to secure our systems. We also engaged a forensic security firm to assist with our investigation and confirm the security of our computer systems. The forensic investigation determined that an unknown, unauthorized third party accessed our computer systems between February 29, 2024, and March 2, 2024, and encrypted some of our computer files. The investigation also determined that the third party may have accessed and acquired certain files from our systems during this period[9]

29.    Numotion admits that employees' PII was unauthorizedly accessed in the Data Breach, including their Social Security numbers and "employment information."[10]

30.    Defendant did not have adequate security protocols to prevent, detect, and stop the cybercriminals from executing the cyberattack on Numotion's systems

_____

[9] Ex. A.
[10] *Id.*

and accessing the voluminous PII of Plaintiff and the proposed Class Members which was stored therein in the Data Breach.

31. Further, Numotion failed to implement reasonable security measures, causing it to lose control over employees' PII in the Data Breach.

32. Defendant's tortious conduct and breach of contractual obligations, as explained hereinafter, are evidenced by their failure to recognize the Data Breach until cybercriminals had already accessed the data, meaning Numotion had no effective means to detect and prevent attempted data breaches.

33. Despite discovering the Data Breach on March 2, 2024, Defendant waited until April 15, 2024 to notify affected employees, which it did in writing in Numotion's Data Breach Notice, Exhibit A.

34. According to Defendant, after discovering the Data Breach, Numotion took the following steps:

> **What We Are Doing.** In addition to the actions described above, we have also taken steps to reduce the risk of this type of incident occurring in the future, including enhancing our technical security measures. We are also notifying you of the incident so that you can be aware and take steps to protect your information, if you feel it is appropriate to do so. Finally, although we are not aware of any instances of fraud or identity theft resulting from this incident, out of an abundance of caution, we are offering a complimentary one-year membership of Experian IdentityWorksSM Credit 3B. This product helps detect possible misuse of your personal information and provides you with identity protection services focused on prompt identification and resolution of identity theft. IdentityWorks Credit 3B is completely free to you and enrolling in this program will not hurt your credit score.[11]

---

[11] *Id.*

9

35.     Numotion's Data Breach Notice minimized the consequences of the Data Breach, stating that, "[w]e are not aware of any instances of fraud or identity theft resulting from this incident," yet Numotion encouraged Data Breach victims to "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."[12]

36.     Numotion further advised affected employees to contact Experian IdentityWorks, and informed them of their abilities to place fraud alerts with the three (3) credit bureaus, and to place a security freeze on their credit reports.[13]

37.     Numotion offered victims of the Data Breach identity theft protection services through Experian IdentityWorks, including 12 months of credit monitoring and identity theft recovery services.[14]

38.     Numotion waited until April 15, 2024, to report the Data Breach to the Maine Attorney General and other necessary consumer agencies, reporting that it involved an "external system breach (hacking)"; that the breach occurred from February 29, 2024 to March 2, 2024, that it was discovered on March 4, 2024;[15] and

_____

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] While Numotion reported to the Maine Attorney General that it "discovered" the Data Breach on October 12, 2023, the Data Breach Notice itself reveals that October 12, 2023 was the date Numotion reviewed the results of a forensic investigation, whereas Numotion discovered the Data Breach on November 16, 2022. See Ex. A.

that 4,190 persons were affected.[16]

39.     As a result of the Data Breach, its victims face a lifetime risk of identity theft, as it includes sensitive information that cannot be changed, like their dates of birth and Social Security numbers. Accordingly, Numotion's identity theft protection and credit monitoring through IDX is wholly insufficient to compensate Plaintiff and the Class Members for their damages caused by the Data Breach.

40.     Indeed, as a result of the Data Breach which Defendant permitted to occur by virtue of its inadequate data security practices, Plaintiff and the proposed Class Members have suffered injury and damages, including identity theft and fraudulent charges, being forced to expend significant time and effort to remediate the consequences of the breach, as well as anxiety and emotional distress.

## C.  Plaintiff's Experience

41.     Plaintiff is a former employee of Numotion.  Plaintiff was employed with Numotion from 2021-2024.

42.     As a material condition of employment, Plaintiff was required to provide Defendant with his PII, including his full name, date of birth, social security number, and other employment information.

43.     On or about April 15, 2024, Plaintiff received Numotion's Data Breach Notice, informing him that his name, date of birth, Social Security Number and "employment information" were compromised and unauthorizedly disclosed in the

---

[16] *See*: Numotion's Data Breach Notification to Maine Attorney General, avail. at https://apps.web.maine.gov/online/aeviewer/ME/40/f89b1165-bd64-451a-bb19-82788fde9f96.shtml (last acc. Feb. 19, 2024).

Data Breach.

44.    As a result of the Data Breach, Plaintiff has spent considerable time and effort attempting to remediate the harmful effects of the Data Breach, including seeking legal advice in response to the Data Breach, and to prevent fraudulent misuse or damages, as well as time and effort to monitor his accounts to protect himself from additional identity theft.

45.    Plaintiff fears for his personal financial security and uncertainty over the information compromised in the Data Breach. He is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

46.    Plaintiff was highly disturbed by the Data Breach's nature and the thought of cybercriminals accessing his highly sensitive PII and the harm caused by the Data Breach.    This has been compounded by Numotion's delay in notifying Plaintiff of the Data Breach. Plaintiff has had to expend the above time and effort to rectify the results of the Data Breach and does not know how many more attempts may arise for his lifetime.

47.    As a result of Numotion's Data Breach, Plaintiff faces a lifetime risk of additional identity theft, as it includes sensitive information that cannot be changed, like his Social Security number.

**D.  This Data Breach was Foreseeable by Numotion.**

48.    Plaintiff and the proposed Class Members provided their PII to

Numotion with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access. By failing to do so, Defendant put all Class Members at risk of identity theft, financial fraud, and other harms.

49. Defendant tortiously failed to take the necessary precautions required to safeguard and protect the PII of Plaintiff and the Class Members from unauthorized disclosure. Defendant's actions represent a flagrant disregard of Plaintiff's and the other Class Members' rights.

50. Plaintiff and Class members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing PII and the critical importance of providing adequate security for that information.

51. Cyber-attacks against institutions such as Defendant are targeted and frequent. According to Contrast Security's 2023 report, "Cyber Bank Heists: Threats to the financial sector," "[o]ver the past year, attacks have included banking trojans, ransomware, account takeover, theft of client data and cybercrime cartels deploying 'trojanized' finance apps to deliver malware in spear-phishing campaigns."[17] In fact, "40% [of financial institutions] have been victimized by a ransomware attack."[18]

52. According to the Identity Theft Resource Center's January 24, 2022

---

[17]Contrast Security, "Cyber Bank Heists: Threats to the financial sector," pg. 5, avail. at https://www.contrastsecurity.com/hubfs/Cyber%20Bank%20Heists%20Report%202023.pdf?hsLang=en (last acc. February 9, 2024).
[18] *Id.,* pg. 15.

13

report for 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[19]

53.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Numotion. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[20]

54.     Based on data from the Maine Attorney General, as of August 2022, "…at least 79 financial service companies have reported data breaches affecting 1,000 or more consumers, and the total number of consumers affected by these breaches could be as high as 9.4 million."[21]

55.     PII is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used for a variety of unlawful and nefarious

---

[19] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last acc. Feb. 9, 2024).
[20] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last acc. Feb. 9, 2024).
[21] Carter Pape, "Breach data from Maine shows scope of bank, credit union exposures," American Banker, August 24, 2022, available at https://www.americanbanker.com/news/breach-data-from-maine-shows-scope-of-bank-credit-union-exposures

purposes, including ransomware and fraudulent misuse, and sale on the Dark Web.

56.     PII can be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This can be accomplished alone, or in combination with other personal or identifying information that is connected, or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.

57.     Given the nature of the Data Breach, it was foreseeable that the compromised PII could be used by hackers and cybercriminals in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and the Class Members' PII can easily obtain their tax returns or open fraudulent credit card accounts in the Class Members' names.

## E.  Numotion Failed to Comply with FTC Guidelines

58.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

59.     In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal client information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that

15

businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[22]

60.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[23]

61.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect client data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

62.     These FTC enforcement actions include actions against entities failing to safeguard PII such as Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016)

---

[22] *See* Federal Trade Commission, October 2016, "Protecting Private information: A Guide           for           Business,"           available           at https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf (last acc. Feb. 9, 2024).
[23] *See id*.

("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

63.     Numotion failed to properly implement basic data security practices widely known throughout the industry. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to client PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

64.     Defendant was at all times fully aware of its obligations to protect the PII of its employees. Numotion was also aware of the significant repercussions that would result from its failure to do so.

## F.  Numotion Fails to Comply with Industry Standards

65.     A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

66.     The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and

Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[24]

67.     In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.

- Use security software to protect data.

- Encrypt sensitive data, at rest and in transit.

- Conduct regular backups of data.

- Update security software regularly, automating those updates if possible.

- Have formal policies for safely disposing of electronic files and old devices.

- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[25]

68.     Further still, the Cybersecurity & Infrastructure Security Agency

_____

[24] *See* Rapid7, "CIS Top 18 Critical Security Controls Solutions," available at https://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. Feb. 9, 2024).
[25] Federal Trade Commission, "Understanding The NIST Cybersecurity Framework," https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Feb. 9, 2024).

makes specific recommendations to organizations to guard against cybersecurity attacks, including (1) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (2) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (3) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[26]

     69.    Upon information and belief, Numotion failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-

---

[26] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at https://www.cisa.gov/shields-guidance-organizations (last acc. Feb. 9, 2024).

2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards for protecting Plaintiff's and the proposed Class Members' PII, resulting in the Data Breach.

## G. The Data Breach Caused Plaintiff and the Class Members Injury and Damages

70. Plaintiff and members of the proposed Class have suffered injury and damages from the misuse of their PII that can be directly traced to Numotion, that has occurred, is ongoing, and/or imminently will occur.

71. As stated prior, in the Data Breach, unauthorized cybercriminals were able to access the Plaintiff's and the proposed Class Members' PII, which is now being used for fraudulent purposes and/or has been sold for such purposes, causing widespread injury and damages.

72. The ramifications of Numotion's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

73. Because Numotion failed to prevent the Data Breach, Plaintiff and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiff and the Class Members have suffered, will imminently suffer, or are at an increased risk of suffering:

a. Fraudulent misuse of PII, fraudulent charges, and fraudulent loan applications;

b. The loss of the opportunity to control how PII is used;

c. The diminution in value of their PII;

d. The compromise and continuing publication of their PII;

e. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

f. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

g. Delay in receipt of tax refund monies;

h. Unauthorized use of stolen PII; and

i. The continued risk to their PII, which remains in the possession of Numotion and is subject to further breaches so long as Numotion fails to undertake the appropriate measures to protect the PII in its possession.

74. Furthermore, the Data Breach has placed Plaintiff and the proposed Class Members at an increased risk of fraud and identity theft.

75. There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in

21

victim's names; victim's losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing home due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the Dark Web forever; victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.[27]

76.    The FTC recommends that identity theft victims take time and effort intensive or costly steps to protect their personal and financial information after a data breach, including contacting the company where the fraud occurred and asking them to close or freeze accounts and changing login information; contacting one of the credit bureaus to place a fraud alert on credit files (consider an extended fraud alert that lasts for 7 years if someone steals their identity); reviewing their credit reports; seeking a credit freeze; correcting their credit reports; and other steps such as contacting law enforcement and reporting the identity theft to the FTC.[28]

---

[27] *See* Gaetano DiNardi, Aura.com, "How Bad Is Identity Theft? Is It Serious?" (December 14, 2022) available at https://www.aura.com/learn/dangers-of-identity-theft#:~:text=Fraudsters%20can%20open%20new%20accounts,to%20repair%20your%20credit%20score (last acc. Feb. 9, 2024).

[28] *See* Federal Trade Commission, available at https://www.identitytheft.gov/Steps (last acc. Feb. 9, 2024).

77. Identity thieves use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

78. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

79. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive other services in the victim's name, and may even give the victim's PII to police during an arrest—resulting in an arrest warrant being issued in the victim's name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

80. Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls: For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. 35% reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. 54% percent reported feelings of being violated. [29]

---

[29] Jason Steele, *Credit Card and ID Theft Statistics*, CreditCards.com (June 11, 2021), avail. at https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ citing Identity Theft Resource Center, "2021 Consumer Aftermath Report," May 26, 2021 available at https://www.idtheftcenter.org/post/the-identity-

81.     What's more, theft of PII is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, PII/PHI is a valuable property right.[30]

82.     The value of sensitive information is axiomatic; one need only consider the value of Big Data in corporate America, or that the consequences of cyber theft include heavy prison sentences. Even the obvious risk to reward analysis of cybercrime illustrates beyond doubt that PII has considerable market value.

83.     It must also be noted there may be a substantial time lag–measured in years–between when harm occurs versus when it is discovered, and also between when PII and/or financial information is stolen and when it is used.

84.     PII and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

85.     Where the most PII belonging to Plaintiff and Class Members was accessible from Numotion's network, there is a strong probability that entire batches of stolen information have been dumped on the black market, and are yet to be dumped on the black market, meaning Plaintiff and the Class Members are at an

theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/ (last acc. Feb. 9, 2024).

[30] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private information") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

24

increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and the Class Members must vigilantly monitor their financial accounts for many years to come.

86.     While credit card information can sell for as little as $1-$2 on the black market, other more sensitive information can sell for as much as $363, according to the Infosec Institute. PII is particularly valuable because criminals can use it to target victims with frauds and scams, posing as medical personnel through the use of otherwise sacrosanct information. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

87.     Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud.[31]

88.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a

---

[31] *See* U.S. Social Security Administration, "Identity Theft and Your Social Security Number," Publication No. 05-10064, July 2021, available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last acc. Feb. 9, 2024).

job using a false identity.[32] Each of these fraudulent activities is difficult to detect. An individual may not know that his or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

102.    Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[33]

103.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[34]

104.    Accordingly, the Data Breach has caused Plaintiff and the proposed

---

[32] *See id.*

[33] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited February 12, 2024).

[34] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited February 12, 2024).

26

Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein, specifically the criminal fraudulent activity, fraudulent charges, theft of monies, and attendant costs, lost time and efforts in remediating the impact of the Data Breach, and other injury and damages as set forth in the preceding paragraphs.

105. Numotion knew or should have known of these harms which would be caused by the Data Breach they permitted to occur, and strengthened its data systems accordingly.

## CLASS ALLEGATIONS

114. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

115. Plaintiff brings this nationwide class action individually and on behalf of all other persons similarly situated ("the Nationwide Class") pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, and Fed. R. Civ. P. 23(b)(3).

116. Plaintiff proposes the following Class definition(s), subject to amendment based on information obtained through discovery:

> **All persons whose PII was compromised as a result of the Data Breach experienced by Numotion beginning on February 29, 2024, as announced by Numotion, including all persons who received the Data Breach Notice.**

117. Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this

27

case is assigned, their families and members of their staff.

118.    Plaintiff reserves the right to amend the definition of the Class or add a class or subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

119.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of Class Members' claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims for each Class Member.

120.    This action satisfies the requirements for a class action under Fed. R. Civ. P. 23(a)(1)-(3) and Fed. R. Civ. P. 23(b)(2), including requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority.

121.    **Numerosity, Fed. R. Civ. P. 23(a)(1):** The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the PII of approximately 4,190 employees of Defendant was compromised in the Data Breach. Such information is readily ascertainable from Defendant's records.

122.    **Commonality, Fed. R. Civ. P. 23(a)(2):** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

        a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII;

28

b.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.   Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, the FTC Act;

d.   Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.   Whether hackers obtained Class Members' PII in the Data Breach;

f.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

g.   Whether Plaintiff and the Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

h.   Whether Defendant breached the covenant of good faith and fair dealing implied in its contracts with Plaintiff and Class Members;

i.   Whether Defendant's acts violated Illinois law, and;

j.   Whether Plaintiff and the Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

123. **Typicality, Fed. R. Civ. P. 23(a)(3):** The claims or defenses of Plaintiff are typical of the claims or defenses of the proposed Class because Plaintiff's claims

are based upon the same legal theories and same violations of law. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII, like that of every other Class Member, was compromised in the Data Breach.

124. **Adequacy, Fed. R. Civ. P. 23(a)(4):** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

125. **Predominance, Fed. R. Civ. P. 23(b)(3):** Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data—PII—was stored on the same computer systems and unlawfully exposed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

126. **Superiority, Fed. R. Civ. P. 23(b)(3):** A class action is a superior method for the fair and efficient adjudication of this controversy because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, and joinder of the Class Members is otherwise impracticable. Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation for many reasons, including the following:

      a.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.

Many members of the Class are not in the position to incur the expense and hardship of retaining their own counsel to prosecute individual actions, which in any event might cause inconsistent results.

b.    When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Class. This will promote global relief and judicial efficiency in that the liability of Defendant to all Class Members, in terms of money damages due and in terms of equitable relief, can be determined in this single proceeding rather than in multiple, individual proceedings where there will be a risk of inconsistent and varying results.

c.    A class action will permit an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions. If Class Members are forced to bring individual suits, the transactional costs, including those incurred by Defendant, will increase dramatically, and the courts will be clogged with a multiplicity of lawsuits concerning the very same subject matter, with identical fact patterns and the same legal issues. A class action will promote a global resolution and will promote uniformity of relief as to the Class Members and as to Defendant.

31

d.     This lawsuit presents no difficulties that would impede its management by the Court as a class action. The class certification issues can be easily determined because the Class includes only Numotion's employees, the legal and factual issues are narrow and easily defined, and the Class membership is limited. The Class does not contain so many persons that would make the Class notice procedures unworkable or overly expensive. The identity of the Class Members can be identified from Defendant's records, such that direct notice to the Class Members would be appropriate.

127.   In addition, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

128.   Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.     Whether Defendant failed to timely and adequately notify the public of the Data Breach;

b.     Whether Numotion owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

32

c. Whether Numotion's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Numotion's failure to institute adequate protective security measures amounted to negligence;

e. Whether Numotion failed to take commercially reasonable steps to safeguard client PII; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

129. Finally, all members of the proposed Class are readily ascertainable. Numotion has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

130. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

131. Defendant required Plaintiff and the Class Members to submit private, confidential PII to it, as a condition of employment.

132. Plaintiff and the Class Members are individuals who provided certain PII to Defendant including their names, social security numbers, dates of birth, and

33

other personal information.

133. Defendant had full knowledge of the sensitivity of the PII to which it was entrusted, and the types of harm that Plaintiff and the Class Members could and would suffer if the PII was wrongfully disclosed to unauthorized persons. Defendant had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information.

134. Plaintiff and the Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their data in Defendant's possession.

135. By collecting and storing this data in its computer systems, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect if that PII was exposed to the internet and to give prompt notice to those affected in the case of a data breach.

136. Defendant owed a duty of care to Plaintiff and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

137. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its employees, which is recognized by laws and regulations including but not limited to the FTC Act,

as well as the common law. Defendant was able to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

138. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

139. Defendant's duty to use reasonable care in protecting confidential data and PII arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

140. Defendant breached its duties, and was negligent, by acts of omission or commission, by failing to use reasonable measures to protect the Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

    b.    Failing to adequately train employees on proper cybersecurity protocols;

    c.    Failing to adequately monitor the security of its networks and systems;

    d.    Failure to periodically ensure that its network system had plans

35

in place to maintain reasonable data security safeguards;

e.  Allowing unauthorized access to Plaintiff's and Class Members' PII;

f.  Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

141.  It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' PII would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyber-attacks and data breaches in the industry.

142.  It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' PII would result in one or more types of injuries to them.

143.  As a direct and proximate result of Defendant's negligence set forth in the preceding paragraphs, Plaintiff and Class Members have suffered injury and damages as set forth herein, including monetary damages, fraudulent misuse of their PII and fraudulent charges; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to compensatory, consequential, and incidental damages as a result of the Data Breach.

144.  Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring

procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

145. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

146. Through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for employment, and that Defendant would deal with them fairly and in good faith, as well as implied contracts for the Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII entrusted to Defendant.

147. Specifically, Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendant when they first applied for or began employment.

148. The valid and enforceable implied contracts that Plaintiff and Class Members entered into with Defendant included Defendant's promise to protect nonpublic PII given to Defendant, or that Defendant created on its own, from unauthorized disclosures. Plaintiff and Class Members provided this PII in reliance of that promise.

149. Defendant solicited and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class

37

Members accepted Defendant's offers and provided their PII to Defendant.

150. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act.

151. Plaintiff and Class Members who partnered or contracted with Defendant for employment and who provided their PII to Defendant, reasonably believed and expected that Defendant would adequately employ adequate data security to protect that PII. Defendant failed to do so.

152. Under the implied contracts, Defendant promised and was obligated to: (a) provide employment to Plaintiff and Class Members; and (b) protect Plaintiff's and the Class Members' PII: (i) provided to obtain such services and/or (ii) created in connection therewith. In exchange, Plaintiff and Class Members agreed to provide labor and to turn over their PII.

153. Both the provision of employment, and the protection of Plaintiff's and Class Members' PII, were material aspects of these implied contracts.

154. The implied contracts for employment—contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Class Members' PII—are also acknowledged, memorialized, and embodied in multiple documents, including Defendant's Privacy Policy as described in the preceding paragraphs.

155. Defendant's representations, including, but not limited to those found in its Privacy Policy, described in the preceding paragraphs, memorialize and embody an implied contractual obligation requiring Defendant to implement data security

adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII.

156. Plaintiff and the Class Members as employees of Defendant value their privacy, the privacy of their dependents, and the ability to keep their PII private. To employees such as Plaintiff and the Class Members, Defendant's practices that do not adhere to industry-standard data security protocols to protect PII render the employment fundamentally less useful and less valuable than those which adhere to industry-standard data security.

157. Plaintiff and Class Members would not have entrusted their PII to Defendant and entered into these implied contracts with Defendant without an understanding that their PII would be safeguarded and protected, or entrusted their PII to Defendant, directly or indirectly, in the absence of its implied promise to monitor its computer systems and networks to ensure that PII was not disclosed to unauthorized parties and exposed to the public as occurred in the Data Breach.

158. A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their PII to Defendant and agreed Defendant would receive labor for, amongst other things, (a) employment and (b) the protection of their PII.

159. Plaintiff and the Class Members performed their obligations under the contracts when they agreed Defendant would receive labor and provided their PII to Defendant.

160. Defendant materially breached its contractual obligations to protect the nonpublic PII of Plaintiff and the Class Members which Defendant required and

gathered when the information was unauthorizedly disclosed in the Data Breach.

161.    Defendant materially breached its contractual obligations to deal fairly and in good faith with Plaintiff and the Class Members when it failed to take adequate precautions to prevent the Data Breach and failed to promptly notify them of the Data Breach.

162.    Defendant materially breached the terms of its implied contracts, including, but not limited to, the terms stated in the relevant Privacy Policy. Defendant did not maintain the privacy of Plaintiff's and the Class Members' PII. Specifically, Defendant did not comply with industry standards, the standards of conduct embodied in statutes like Section 5 of the FTC Act, or otherwise protect Plaintiff's and the Class Members' PII, as set forth above.

163.    The Data Breach was a reasonably foreseeable consequence of Defendant's conduct, by acts of omission or commission, in breach of these contracts.

164.    As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received employment that was of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

165.    Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, the Class Members, nor any reasonable person would have contracted for employment with

40

Defendant.

166.    As a direct and proximate result of the Data Breach, Plaintiff and the Class Members have suffered injury and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they had struck with Defendant.

167.    Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

168.    Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

169.    Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

170.    This claim is pleaded in the alternative to the claim of breach of implied contract (Count II).

171.    Plaintiff and members of the Class conferred benefits upon Defendant in the form of agreeing to employment in exchange for labor. Also, Defendant received additional benefits from receiving the PII of Plaintiff and members of the Class—such data is used to facilitate both payment and the provision of employment services.

41

172.     Defendant appreciated or knew of these benefits that it received. And under principles of equity and good conscience, this court should not allow Defendant to retain the full value of these benefits—specifically, the labor it received and PII of Plaintiff and members of the Class.

173.     After all, Defendant failed to adequately protect Plaintiff's and Class Members' PII. And if such inadequacies were known, then Plaintiff and the members of the Class would never have agreed to provide labor to Defendant, nor disclosed their PII.

174.     Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and members of the Class—all funds that were unlawfully or inequitably gained despite Defendant's misconduct and the resulting Data Breach.

## COUNT IV
## BREACH OF CONFIDENCE
### (On Behalf of Plaintiff and the Class)

175.     Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

176.     At all times during Plaintiff's and Class Members' interactions with Defendant and/or its agents, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' PII.

177.     Defendant's relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized parties.

178. Plaintiff and Class Members provided their PII to Defendant and/or its agents with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized parties.

179. Plaintiff and Class Members also provided their PII to Defendant and/or its agents with the explicit and implicit understandings that Defendant would take precautions to protect such PII from unauthorized disclosure.

180. Defendant voluntarily received in confidence Plaintiff's and Class Members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

181. Due to Defendant's failure to prevent, detect, or avoid the Data Breach from occurring by, inter alia, following industry standard information security practices to secure Plaintiff's and Class Members' PII, Plaintiff's and Class Members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

182. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff and Class Members have suffered damages.

183. But for Defendant's disclosure of Plaintiff's and Class Members' PII in violation of the parties' understanding of confidence, their protected PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' protected PII, as well as the resulting damages.

184. The injury and harm Plaintiff and Class Members suffered was the

43

reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff' and Class Members' PII.

185. As a direct and proximate result of Defendant's breach of confidence, Plaintiff and Class Members have suffered and will suffer injury and damages as set forth herein, including monetary damages, fraudulent misuse of their PII and fraudulent charges; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to compensatory, consequential, and incidental damages as a result of the Data Breach.

186. As a direct and proximate result of Defendant's breach of confidence, Plaintiff and Class Members have suffered and will continue to suffer injury and/or harm.

## COUNT V
## INVASION OF PRIVACY—INTRUSION UPON SECLUSION
### (On Behalf of Plaintiff and the Class)

187. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

188. Plaintiff and the Class had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

189. Defendant owed a duty to its employees, including Plaintiff and the Class Members, to keep their PII confidential.

190. Defendant failed to protect said PII and exposed the PII of Plaintiff and

44

the Class Members to unauthorized persons which is now publicly available, including on the dark web, and being fraudulently misused.

191. Defendant allowed unauthorized third parties access to and examination of the PII of Plaintiff and the Class Members, by way of Defendant's failure to protect the PII.

192. The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and the Class Members is highly offensive to a reasonable person.

193. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and the Class Members disclosed their PII to Defendant as a condition of receiving employment, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and the Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

194. The Data Breach constitutes an intentional or reckless interference by Defendant with Plaintiff's and the Class Members' interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

195. Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because they had actual knowledge that its information security practices were inadequate and insufficient.

196. Defendant acted with reckless disregard for Plaintiff's and Class

Members' privacy when they allowed improper access to its systems containing Plaintiff's and Class Members' PII.

197.   Defendant was aware of the potential of a data breach and failed to adequately safeguard their systems and implement appropriate policies to prevent the unauthorized release of Plaintiff's and Class Members' PII.

198.   Because Defendant acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and the Class Members.

199.   As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiff and the Class Members was disclosed to third parties without authorization, causing Plaintiff and the Class Members to suffer injury and damages as set forth herein, including  monetary damages, fraudulent misuse of their PII and fraudulent charges; loss of the opportunity to control how their PII is used; diminution in value of their PII; compromise and continuing publication of their PII; and are entitled to compensatory, consequential, and incidental damages as a result of the Data Breach.

200.   Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class Members in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and the Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and

46

the Class Members.

**COUNT VI**
**BAILMENT**
**(On Behalf of Plaintiff and the Class)**

201. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

202. Plaintiff, the Class Members, and Defendant contemplated a mutual benefit bailment when the Plaintiff and putative members of the Class transmitted their PII to Defendant solely for the purpose of obtaining employment.

203. Plaintiff and the Class entrusted their PII to Defendant for a specific purpose—to obtain employment—with an implied contract that the trust was to be faithfully executed, and the PII was to be accounted for when the special purpose was accomplished.

204. Defendant accepted the Plaintiff's and the Class's PII for the specific purpose of obtaining employment.

205. Defendant was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiff's and the Class's PII.

206. Plaintiff and the Class's PII was used for a different purpose than the Plaintiff and the Class intended, for a longer time period and/or in a different manner or place than Plaintiff and the Class intended.

207. As set forth in the preceding paragraphs, Plaintiff and the Class Members were damaged thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, SHAUN DUCREPIN, on behalf of himself, and all others similarly situated, prays for judgment as follows:

A.     Trial by jury pursuant to Fed. R. Civ. Proc. 38(b) on all claims so triable;

B.     An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

C.     Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

D.     Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

E.     Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

F.     Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

G.     Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the transmitted PII;

H.     Awarding attorneys' fees and costs, as allowed by law,

I.      Awarding prejudgment and post-judgment interest, as provided by law;

J.     Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and,

K.     Any and all such relief to which Plaintiff and the Class are entitled.

Dated: May 2, 2024                          Respectfully submitted,

                                            _/s/ J. Gerard Stranch, IV_____
                                            J. Gerard Stranch, IV (BPR 23045)
                                            Andrew E. Mize*
                                            STRANCH, JENNINGS & GARVEY, PLLC
                                            The Freedom Center
                                            223 Rosa L. Parks Avenue, Suite 200
                                            Nashville, Tennessee 37203
                                            (615) 254-8801
                                            (615) 255-5419 (facsimile)
                                            gstranch@stranchlaw.com
                                            amize@stranchlaw.com

                                            Lynn A. Toops*
                                            Amina A. Thomas*
                                            COHEN & MALAD, LLP
                                            One Indiana Square, Suite 1400
                                            Indianapolis, Indiana 46204
                                            (317) 636-6481
                                            ltoops@cohenandmalad.com
                                            athomas@cohenandmalad.com

                                            Samuel J. Strauss*
                                            Raina Borelli*
                                            STRAUSS BORELLI PLLC
                                            908 N. Michigan Avenue, Suite 1610
                                            Chicago Illinois 60611
                                            Telephone: (872) 263-1100
                                            Facsimile: (872) 263-1109
                                            sam@straussborrelli.com
                                            raina@straussborrelli.com

                                            *Motion for *Pro Hac Vice* Admission
                                            forthcoming

                                            **Counsel for Plaintiff and the Proposed
                                            Class**

49